186  541
s186 555
186      541
f 208    1 57
186      541
222     1499

# Sebastian A. Rudolph *v.* The Pennsylvania Schuylkill Valley Railroad Company, Appellant.

*Eminent domain—Assessment of damages—Railroads.*

In order that two properties having no physical connection may be regarded as one in the assessment of damages for right of way, they must be so inseparably connected in the use for which they are applied, as that the injury and destruction of one must necessarily and permanently injure the other.

In proceedings against a railroad to recover damages for land condemned, it appeared that the owner had bought the tract through which the right of way was taken for the purpose of manufacturing paper. There was a stream of pure water on the land, and the owner built thereon a reservoir and a paper mill. Several years before the proceedings were begun another railroad company had appropriated a right of way through the tract, and long afterwards plaintiff conveyed to the same company a strip adjoining this right of way for railroad purposes. The mill was on one side of this right of way, and the stream and reservoir on the other. It appeared that the paper mill could not have been operated without the stream and reservoir. *Held*, that the water and the land constituted an indispensable appurtenance of the mill, and made the whole one property, and that the mere right of way and conveyance could not destroy its identity as one property.

Where a railroad company condemns a right of way through a tract of land and files a bond, but subsequently abandons this location and takes another through the same tract, consequential injuries from the construction and operation of the road may be considered in estimating the market value at the time the bond was filed.

In condemnation proceedings the railroad company claimed that the owner of the land had been compensated for the pollution of a stream by another railroad company which had some years before located its railroad through the same tract. There was evidence that the company which

had first located its road used anthracite coal which caused no serious inconvenience, while the second company used bituminous coal which had a very polluting effect upon the water. *Held*, that the question whether the owner had already been compensated for the pollution of the water was a question of fact for the jury.

*Eminent domain—Waters—Condemnation of stream for right of way of a railroad—Pollution of stream.*

Where a railroad company appropriates the bed of a stream, in whole or in part, for its right of way, and pollutes the water of the stream by the ordinary operation of its road, it must make compensation to the owner, and the jury may be permitted, in their computation of the value of the land, in statutory condemnation proceedings, to consider the depreciation of the property by the pollution of the stream.

The act of April 9, 1856, authorizing the appropriation of a stream by a railroad company for steam and other railroad purposes, does not apply in a case where the railroad company has appropriated the bed of the stream for its right of way, and has polluted the water of the stream by the ordinary operation of its railroad.

The Supreme Court will not review the discretion of the lower court in condemnation proceedings in refusing to allow the jury to view the water in a pond alleged to have been polluted by the operation of the railroad, and then to view the water again after it had been passed through filters.

*Eminent domain—Railroads—Misdescription of land.*

A petition in condemnation proceedings correctly described the land by its outside boundaries, without striking off by boundaries a small strip through it conveyed to another railroad company. The petition, however, in setting forth the acreage, made allowance for this strip, and there was no evidence that the owner claimed before the jury a quantity more than he owned after the conveyance. *Held*, that there was no such misdescription of the land as would have justified a dismissal of the petition.

*Eminent domain—Railroads—Excessive verdict.*

The Supreme Court will not review a verdict in condemnation proceedings as excessive where there is evidence which if believed by the jury would warrant the amount of the verdict.

Argued Feb. 1, 1897. Reargued Feb. 3, 1898. Appeal, No. 408, Jan. T., 1896, by defendant, from judgment of C. P. Montgomery Co., Oct. T., 1890, No. 107, on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Appeal from jury of view under the statutory proceedings for damages for taking land by right of eminent domain.

The facts appear in the opinion of the Supreme Court.

*Errors assigned* are stated in the opinion of the Supreme Court.

*Wayne MacVeagh*, with him *Charles H. Stinson, C. Henry Stinson* and *William F. Solly*, for appellants.—The taking by the railroad company in both the condemnations now under argument was distinctly limited to a taking of land, carefully described in each case by metes, bounds and contents, without the slightest suggestion appearing anywhere that the company desired or intended to interfere with any water or water right theretofore belonging to the owner of the property.

It is true that the first taking extended by metes and bounds to the middle of the bed of the stream not in controversy, and that the second taking by its metes and bounds was extended in the same manner on the opposite side ; but such takings gave the railroad company no shadow of title to interfere with the stream itself. If it wants any such right, it must ask for it in plain terms, condemn it and pay for it: Act of April 9, 1856, P. L. 295; Denniston v. Phila. Co., 161 Pa. 41.

No damages can be compensated for in these proceedings which are for the appropriation of land only, not of water or water rights, except those which grow out of such appropriation, and which depreciate the market value of the tract immediately before and immediately after the appropriation: Haupt's App., 125 Pa. 211; Lord v. Water Co., 135 Pa. 131; Clark v. R. R., 145 Pa. 452; Miller v. Miller, 9 Pa. 74; P. R. R. Co. v. Miller, 112 Pa. 34; Standard Plate Glass Co. v. Butler Water Co., 41 W. N. C. 192.

*Thad. L. Vanderslice* and *N. H. Larzelere*, with them *John M. Vanderslice*, for appellee.—Plaintiff had a property right in the water for which he was entitled compensation: Gould on Waters, chap. VI. sec. 204; Gardner v. Newburgh, 7 Am. Dec. 527; Angell on Water Courses, sec. 5; Cary v. Daniels, 5 Met. 236; Mayor v. Appold, 42 Md. 442; Wheatley v. Chrisman, 24 Pa. 298; McCallum v. Gtn. Water Co., 54 Pa. 40; Penna. R. R. v. Miller, 112 Pa. 34: Bare v. Hoffman, 79 Pa. 71; Clark v. R. R., 145 Pa. 438; Ripley v. Ry., L. R. 10 Ch. App. 435; Johnson v. Boston, 130 Mass. 452; Union Canal Co. v. Stump, 81* Pa. 360; Glover v. Powell, 10 N. J. Eq. Rep. 229; Ten Eyck v.

Canal Co., 18 N. J. Law, 202; R. R. v. Hill, 56 Pa. 460; Comstock v. Ry., 169 Pa. 587; Penna. R. R. v. Duncan, 111 Pa. 352.

The appellee has no other remedy for this element of the damages which enter into the verdict than that which is statutory: Miller v. Water Co., 148 Pa. 429; Howe v. Weymouth, 148 Mass. 605; Randolph on Eminent Domain, p. 152; North & W. B. Ry. Co. v. Swank, 105 Pa. 555; O'Brien v. R. R. Co., 119 Pa. 184; Hoffeditz v. Railway Co., 129 Pa. 264; Updegrove v. Pa. S. V. R., 132 Pa. 540; Kemp v. Pa. R. R. Co., 156 Pa. 441; Hodge v. Leh. V. R., 39 Fed. Rep. 449; Brady v. Fall River, 121 Mass. 262; Johnson v. City of Boston, 130 Mass. 452; Cassidy v. Old Colony R. R., 141 Mass. 174; Trenton Water Power Co. v. Chambers, 13 N. J. Eq. 199; Van Schoick v. Del. & Rar. Can. Co., 20 N. J. L. 249; Mellen v. R. R., 4 Gray, 301; R. R. v. McCutcheon, 18 W. N. C. 529; R. R. v. Walsh, 124 Pa. 544.

OPINION BY MR. JUSTICE DEAN, July 21, 1898:

This was a proceeding under the statute by plaintiff for damages, resulting from defendant's appropriation of his land, and the construction through it of a steam railroad. The plaintiff owned in fee a tract of about six acres in Lower Merion township, Montgomery county. The land had a frontage of 300 feet on the Schuylkill river, and extended back 1,100 feet; through it flowed a stream known as Gully run, alleged by plaintiff to be pure spring water; on this land, at an expense of over $350,000, he had erected a large paper factory known as the Ashland Paper Mills, operated for the manufacturing of book paper. There were also erected on the land a mansion house with stables, tenement houses for workmen, pulp mills and all the accessories for a proper operation of the plant. There was also upon the land a reservoir for retaining pure water, of an area of about three acres, from which the water pipes leading to the factory were fed. Prior to the erection of the paper mill, the Reading Railroad had been located through the land, upon an elevated structure, having a right of way thirty feet wide. In addition to this appropriation, Rudolph, in May, 1868, conveyed to the same railroad company a strip of land 100 feet wide, containing about seven tenths of an acre, adjoining its right of way, for purposes of a coal siding and freight facilities for his mills.

The company, besides, stipulating that it would at its own proper cost construct sidings and coal bins; further, covenanted that it would in no way obstruct or interfere with the water course upon the property.

In 1890, defendant, desiring to connect its road with the "Pencoyd Iron Works," under its right of domain, condemned about half an acre of the property at the western end, but this, after some work upon it, by a change of plan, was abandoned; and then, by condemnation, were taken, a small part of the ground on which the mansion house was located and the land above the reservoir, including 436 feet of the stream leading to it. This involved to some extent the reconstruction of the bank of the stream to make room for and sustain the railroad bed. The defendant then constructed and commenced operating its railroad. Plaintiff afterwards operated his paper mills, but eventually closed them, in which condition they have remained. Soon after an adverse decision in an equity suit, Rudolph v. Railroad Co., 166 Pa. 430, on March 9, 1895, he commenced this statutory proceeding to have his damages assessed. One petition, that in No. 107, October term, 1890, averred that the railroad company had entered upon and taken about two hundred and twenty-three one thousandths acres of his land west of the Reading railroad, along Gully run, and then down said run and along the Schuylkill river to the Pencoyd Iron Works, that, further, the railroad company, for the purpose of constructing and operating its railroad, had removed the earth and created an artificial embankment for the location of its track, and thereby the stream washed into the earth and carried it into his reservoir or settling pool. And further, by the operation of the road, coal dust, cinders, soot and grease were constantly deposited in the pool, polluting the water and rendering it unfit for manufacturing purposes. Viewers were appointed on this petition who assessed plaintiff's damages at $67,158. From this award plaintiff appealed. On the same day, plaintiff presented another petition averring that the railroad company had appropriated about one half acre of other land for the purpose of constructing its branch to said Pencoyd Iron Works; and in the construction of its road, had removed two dwelling houses, filled up the cellars and located trestlework along the stream, thereby greatly depreciating the

market value of his property; that the water of said stream was polluted by washings of earth occasioned by rain storms; that he had sustained great damage, both direct and consequential; he therefore prayed a view to assess his damages. Viewers were appointed who assessed his damages on this petition at $2,970.40. Plaintiff appealed from this award also. Both appeals, by agreement, were tried in the court below before one struck jury. In the first issue, a verdict was rendered in favor of plaintiff for $110,000; in the second, for $5,360. After full consideration by the court on motions for new trial, judgments for plaintiff were directed on both verdicts, and we have before us two appeals by defendant. A third appeal was tried before the same jury. It related exclusively to the mansion house property, and no question concerning it is involved in the two appeals before us. A new trial was granted, and it is still pending in the court below.

Appellant, in No. 107 of the common pleas, and known in the trial in the court below as claim No. 3, formally prefers seventeen assignments of error, and takes up nearly ten pages of a closely printed paper-book in a mere statement of them. We shall endeavor to give their substance in fewer words:

1. Appellant alleges error in the court's refusal to allow the jury to look at the water in the pool, and then at it after it had passed through filters.

2. Error in refusing to dismiss plaintiff's petition because of misdescription of the property.

3. Error in not giving sufficient significance in the charge to the testimony of one Shelldrake, who had testified that at a moderate expense the pond could be roofed so as to exclude soot and coal dust.

4. Error in refusing to charge, when requested, that the conveyance of the strip by plaintiff to the Reading Railroad Company, May 18, 1868, was a severance of the tract into two distinct parcels of land, and, therefore, there could be no recovery in this proceeding for damages sustained by pollution of the water, and damage to the mill arising from pollution of the stream on another distinct and separate piece of land.

5. This is a substantial repetition of the fourth, with the addition that error is alleged because the court, for the same reason, did not instruct the jury that the sole measure of dam-

ages for their consideration was the difference between the market value of the one piece of land before and immediately after the taking.

6. That, as the Reading Railroad Company had for more than twenty years before the construction of defendant's road been operating its road through said land by steam locomotives which might be fired with bituminous coal, creating soot and dust, it must be assumed as matter of law that plaintiff or his predecessors had been compensated for damage sustained thereby, and the court erred in not so charging the jury when requested by defendant.

7. Error in not charging, when so requested, that it must be presumed that the conveyance by plaintiff to the Reading Company of the strip of land resulted to him in full compensation for any injury to him by reason of the pollution of the water from coal dust, soot and cinders.

8. Error in not deciding, as requested, that, as there was a severance of the tract into two separate parcels, and the petition described the tract as an entirety, there could be no recovery, but that plaintiff must commence by new petitions, describing each tract separately.

9 and 10, are repetitions of the same legal conclusions, which defendant asked the court to announce in the eighth.

11. The court erred in not instructing the jury, as requested by defendant, that, as the evidence showed defendant had already appropriated another and adjoining piece of plaintiff's land, and damages had been assessed therefor, no further assessment could be made, for it should be presumed that all the elements of damages had been included in the first assessment.

12. Error in not instructing the jury, as requested, that, as it had been established by the evidence that all the damage from pollution complained of by plaintiff could be avoided by the use of filters, the measure of damage should be the cost of filters and the expense of their operation.

13. In not instructing the jury, as requested, that, as the evidence established that the pond could be roofed over at a cost of $12,333, that represented the amount of plaintiff's damage, and the jury should award accordingly.

14. In not instructing the jury that the measure of damages is the value of the land actually taken.

15, 16 and 17. The court erred in not setting the verdict aside, because it was excessive.

The fourth to eleventh assignments are mainly based on the assumed fact that there was a severance of the original tract by the construction of the Reading Railroad and the conveyance to that company by the plaintiff of a strip of land for coal and freight sidings. If the fact assumed had no existence the assignments of error fall.

The conveyance to plaintiff is of the land as an entirety, and it was in fact in one tract. The Reading Railroad appropriated a right of way through it, and long afterwards plaintiff conveyed to the same company a strip adjoining this right of way for railroad purposes. Did this make the one tract two? The property was purchased by plaintiff for a distinct purpose, the manufacture of paper; the whole tract was as necessary to his purpose as any part of it; the stream and the land adjoining, while not intended to supply a water power, were intended to secure an uninterrupted and uninterfered with supply of water for manufacturing purposes in the mill. Without the supply of water furnished from the stream and reservoir on the land on the opposite side of the Reading Railroad, the paper mill could not be operated. The water and the land on which it was accumulated constituted an indispensable appurtenance of the mill, and made the whole one property; and the mere right of way and conveyance could not destroy their identity as one property. We think with the court below that the remarks of Justice CLARK, in Potts v. Railroad Co., 119 Pa. 278, are directly in point: " In order that two properties having no physical connection may be regarded as one in the assessment of damages for right of way, they must be so inseparably connected in the use to which they are applied as that the injury and destruction of one must necessarily and permanently injure the other." It is assumed in that case that there may be but one assessment of two properties wholly disconnected, if they are necessarily used as one. Here, the land was not disconnected, except that a common carrier, serving the manufactory, ran its cars over the surface, and even then, plaintiff had a right of way across the railroad. If the taking by defendant had been at one time, instead of at different dates in distinct parcels, one view could have embraced every item of plaintiff's claim. The

court below, therefore, committed no error, in assuming in its instruction to the jury that the property injured by the taking was one property, and that injury to the water which supplied the mill on the part west of the Reading Railroad was a proper subject for consideration in assessing consequential damages to the mill property east of the road. Defendant, further, asked the court to decide, as matter of law, that the appropriation of the land west of the road necessarily included the consequential injury to the mill which the water supplied, and that, whether evidence had been given in that particular or not in that proceeding, it could not be considered in estimating the damages to the mill. To understand this point the order in which the land was appropriated must be noticed. In February, the railroad company located its road across the stream at the head of the reservoir, intending to follow the bank on the north side. This route was subsequently abandoned, and another selected on the south bank of the stream; this taking included the stream and all the tract on the south bank; on this the road was constructed, and has since been operated. There were thus two takings; as the first taking was not followed by the operation of the road, and the second was, the consequential injuries to the mill were in fact sustained by the second taking. The request for instruction was based wholly on a theory, and not on a fact. If the first location had been followed by the construction and operation of the road upon it, then the consequential injury would have arisen by that appropriation; but having been abandoned, the evidence as to pollution of the water related mainly to the second location. As the injury might have been occasioned by the adoption of the first route, but was not, there is no reason why the claim should not be made for the act which really occasioned it. The court below most carefully instructed the jury on the facts proved, and there could not have been any duplication of damages, or any injustice to defendant, when the charge and answers to points are considered together. While the appropriation by the first taking was complete as soon as the railroad company filed its bond, yet the market value of the property is to be determined, not only by the taking, but also, from the construction and operation. And this was the measure of damages the jury was instructed to adopt.

As to the injury being of the same character as that already done by the construction and operation of the Reading Railroad, and it must be assumed, plaintiff had already been compensated by that company, that was a question of fact properly submitted to the jury. It was alleged by plaintiff, the Reading was operated by anthracite coal, and caused no serious inconvenience, while defendant consumed bituminous coal, which had a very polluting effect on the water.

Every question raised by these fourth to eleventh assignments, inclusive, has been so fully and impartially considered by the learned trial judge, in his opinion overruling the motion for a new trial, that it is a waste of time to notice them further.

The fourteenth assignment alleges error in refusing to instruct the jury, that the measure of damages was the value of the land actually taken. We assume that it was intended by this point to withdraw from the consideration of the jury the evidence as to damage from pollution of the water caused by the operation of the railroad.

That the right of the plaintiff in the water is a property right, is abundantly sustained by the authorities. It must be kept in mind, in determining his remedy, that defendant appropriated for its roadbed and embankments a considerable part of the bed of the stream. We are not called upon to consider what would have been his remedy, if any, for the pollution of the water alone, had defendant located its road on the land of another. It is undisputed that they took possession of part of the creek bed. Chancellor KENT, in Gardner v. Newburgh, 2 Johns, Chancery R., 162 says: "A right to a stream of water is as sacred as a right to the soil over which it flows. It is a part of the freehold, of which no man can be disseized, but by lawful judgment of his peers or by due process of law." In a note to this case, 7th Am. Dec. 527, after citing cases following it, it is said: "The right to the use of water is a right of property, depending on the ownership of the land over which the water flows." Angell on Water Courses, sec. 5, says: " The right of private property in a water course is derived as a corporeal right or hereditament from, or is embraced by, the ownership of the soil over which it naturally passes." All our cases, and they are many, distinctly hold this qualified right of property in the riparian owner. The decisions in our state are prac-

tically summarized in Pa. R. R. Co. v. Miller, 112 Pa. 34:
" The upper riparian owner has the right to the use of the
stream on his land for any legal purpose, provided he returns
it to the stream uncorrupted, or without essential diminution."
It is a hereditament which passes with the land by descent,
devise or deed.   Haupt's Appeal, 125 Pa. 211, Lord v. Water
Co., 135 Pa. 131, Clark v. R. R. Co., 145 Pa. 452, and the other
cases cited by appellant, do not touch the question raised here.
In substance, they hold that the riparian right is not an abso-
lute ownership of the water of the stream.   This is not pre-
tended.   The riparian owner could not sell the water to a
nonriparian owner, nor could he possess himself of the whole of
it; such is not his right; his right is qualified by the rights of
the lower riparian owners.   But this qualified right appertain-
ing to his property along the stream adds to the value of the
property.   When plaintiff's property was taken, defendant
injured and, from the evidence, to some extent, destroyed it;
it became useless to him; theretofore he had used the stream
lawfully; now, of that use, by defendant's appropriation of his
land and construction and operation of its road, he has been
deprived.

We have, then, these facts, that the land appropriated had
upon it 436 feet of the stream above the mill, and that the con-
struction and ordinary operation of the road so polluted the
water as to render it unfit for use at the mills.   The damage by
pollution, in results, is not distinguishable from an appropria-
tion; in fact, all the cases treat them as a like interference with
the owner's right.   The plaintiff had established his right to
have the water pure against an upper landowner before this
taking, by a permanent injunction.   See Rudolph v. Dobson,
11 Montgomery L. R. 197.

This brings us then to the question: Should the court have
permitted the jury, in their computation of the value of the
land, to consider the depreciation of the property by the pollu-
tion of the stream?  But little attention was given to this ques-
tion in the court below, nor is there a special assignment of
error.   It seems to have been treated at the trial as a proper
element of damages, although really raised by appellant's twelfth
prayer for instruction, and fourteenth assignment, that " the meas-
ure of damages in this case is the value of the land actually taken."

It has however, at the suggestion of this Court, been reargued by both sides. We now, after careful consideration, think it is settled by both reason and authority. The taking of the land, which formed part of the bed of the stream, and the construction of the road were lawful; the necessary implication from the appropriation and construction was the ordinary and lawful use of the road when constructed. An extraordinary use or an unlawful one was not within the contemplation of the remedial statute, nor of the parties, and, of course, for such damage in the future the plaintiff must seek his remedy under another form of action.

The 11th section of the Act of February 19, 1849, P. L. 79, after conferring on the company the power to fix and determine the extent of the appropriation, further directs that where the owner and company cannot agree upon the damages, the court shall appoint viewers, who shall go upon the premises and " estimate and determine the quantity, quality and value of said lands so taken or occupied . . . . and having a due regard to, and making just allowance for, the advantages which may have resulted or which may seem likely to result to the owner or owners of said land . . . . in consequence of the making or opening of said railroad, and the construction of the works connected therewith; and after having made a fair and just comparison of said advantages and disadvantages, they shall estimate and determine whether any, and if any, what amount of damages has been or may be sustained."

In Watson v. Railroad Co., 37 Pa. 469, the special act under which the railroad company entered provided for a view in case of disagreement with the owner, but gave only authority to estimate the damages, and, in doing so, also to consider the advantages accruing to the owner. It did not, as does the act of 1849, require them to take into consideration the disadvantages. This court, STRONG, J., said: " It would be a narrow construction, however, were we to hold that the legislature did not intend an assessment of all the damages which are the direct and immediate consequence of the construction of the road to the whole tract of land through which it may pass. It is upon the whole tract that the road is located, though only a part is actually occupied. The injury is therefore done to the tract as a whole, of whatever components that injury may consist. The exclusive appro-

priation of a part, the inconvenience arising from division, or from increased difficulty of access, and the cost of additional necessary fencing, are alike the direct and immediate result of the construction of the railroad." The same ruling was made in Railroad Co. v. Hiester, 40 Pa. 53, where it was held that it was proper to admit evidence before the viewers that proximity of the railroad to plaintiff's flour mill made it dangerous for horses to approach, and therefore tended to decrease custom. In Railroad Co. v. Stauffer, 60 Pa. 374, it was held, approving the charge of the court on appeal from award of viewers : " If from any cause the building is unfit for the purpose to which it has heretofore been applied, and for which it is best adapted, the property is certainly and at once depreciated." In Hoffer v. Canal Co., 87 Pa. 221, an appeal also from an award of viewers, at the trial the owner proposed to prove that by the construction of an embankment there would be increased percolation of water on his land, thereby injuring it. The court below, rejected the evidence, saying : " The company is only answerable for taking the land, not for injury caused indirectly by percolation through the banks." This was held to be error, this Court saying : " The viewers are required, after having made a fair and just comparison of the advantages and disadvantages resulting from the construction of the railroad or canal, to estimate what amount of damages have been or may be sustained. As the damages here spoken of cannot have reference to the land actually appropriated, since, as to it, its price is a full compensation, it follows that we must construe the statutory direction to mean an estimation of the depreciation resulting to the remaining lands of the proprietor from the construction of the works. In other words, the statute does, in terms, authorize compensation for damages purely consequential."

It is plain from these and numerous other cases, that the obvious consequence of the appropriation of plaintiff's land, and the construction of the railroad upon it, was the pollution of the water, which, though a consequential injury, nevertheless gives him a claim for damages. The case then comes under a long line of cases which hold that his remedy is under the statute, such as O'Brien v. Railroad. Co., 119 Pa. 184, in which CLARK, J., in delivering the opinion of the Court, says : " It has been repeatedly held, construing this act of 1849, that when the

railroad has been located, the land has been taken and appropriated for public use; that the right of the land owner to sue for his damages is complete, and he may recover all which may be caused by the location and by the subsequent construction; that he can have but one action, and the damages cannot be severed." Here, the action was case, and there was no taking of the claimant's property; the injury complained of was suffered, it was alleged, when the appropriation was made in the lifetime of the owner; the construction and completion were after his death. The court below instructed the jury that the one who owned the injured property when the work was completed was alone entitled to recover. This was held to be error; that there could be no severance; the moment of appropriation with a view to construction, gave the right of action. In several cases, commencing with Railway Co. v. Swank, 105 Pa. 555, we have held that a mere release by the owner of the right of way was a bar to a subsequent action for damages from the construction and lawful operation of the railroad. The plaintiff could not sever his action under the statute from his consequential injury by the lawful operation of the road. There could not be two actions for one cause. Therefore, in the trial, the court below properly passed on plaintiff's whole claim.

The second section of the Act of April 9, 1856, P. L. 295, has no application to the facts before us. The intention of that act clearly was to authorize the appropriation by a railroad company, for steam and other railroad purposes, of water and water rights. The land appropriated here was for a roadbed, with the consequent damage from the construction. The company did not appropriate a gallon of water for any purpose under the right of eminent domain conferred by the act of 1856.

The first assignment, alleging error in refusing to allow the jury to view the water in the pond, and then after it had been passed through filters, was a question for the court's discretion, and it is not the subject of review.

The second complains of the refusal to dismiss the petition because of the misdescription of the land. There was no serious error in the description; it, in substance, described the land correctly by its outside boundaries, without striking off by boundaries the strip conveyed to the railroad company. But, instead of calling for over six acres, the quantity included in

the boundaries, the petition set forth that there were but five
and one half acres. There is no evidence that plaintiff claimed
before the viewers a quantity more than he owned after the
conveyance.

The third assignment is without merit; the court gave to the
evidence all the significance it was entitled to. The same may
be said of the twelfth and thirteenth.

As to the fifteenth, sixteenth and seventeenth which com-
plain of the verdict as excessive, the court below did not think
so. As there was evidence which, if believed by the jury, war-
ranted it, it is not of that excessive character which calls for
review here.

The judgment is affirmed.